# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **OLGA TRUSOV**, | Case No. 3:23-cv-77-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **OREGON HEALTH & SCIENCE UNIVERSITY**, | |
| Defendant. | |

Brent H. Smith, BAUM SMITH LLC, PO Box 967, 808 Adams Avenue, La Grande, OR 97850. Of Attorneys for Plaintiff.

Thomas R. Johnson, Brenda K. Baumgart, Alex Van Rysselberghe, and Alexandra Choi Giza, STOEL RIVES LLP, 760 SW Ninth Avenue, Suite 3000, Portland, OR 97205. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff Olga Trusov brings this lawsuit against her former employer Oregon Health &

Science University ("OHSU"). Trusov worked for OHSU as a Registered Nurse in the Neonatal

Intensive Care Unit ("NICU") from August 2013 until OHSU terminated her employment on

December 6, 2021. Trusov failed to comply with OHSU's COVID-19 vaccination policy, and

OHSU denied her request for a religious accommodation that would have exempted her from

OHSU's vaccination requirement. In her Second Amended Complaint ("SAC") (ECF 25), Trusov alleges that OHSU violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, by discriminating against her because of her religion. OHSU moves for summary judgment, and Trusov cross-moves for partial summary judgment.[1] The Court has heard oral argument on the motions. For the reasons explained below, the Court grants OHSU's motion and denies Trusov's cross-motion.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex*, 477 U.S. at 325)). "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "If the moving party meets its initial burden, the non-moving

---

[1] Trusov combines her response to OHSU's motion for summary judgment with her cross-motion. Under Local Rule 7-1(b), however, "[m]otions may not be combined with any response, reply, or other pleading." The Court nevertheless considers Trusov's cross-motion on the merits.

party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson*, 477 U.S. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"When cross-motions for summary judgment are at issue, [courts] evaluate 'each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences.'" *Zabriskie v. Fed. Nat'l Mortg. Ass'n*, 940 F.3d 1022, 1026 (9th Cir. 2019) (quoting *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006)); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *L. V. Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party bears the burden of designating "specific

facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

## BACKGROUND

### A. COVID-19 and Vaccine Mandates for Healthcare Workers

On August 13, 2021, amid the surge in COVID-19 cases, the Governor of Oregon issued Executive Order 21-29 (the "EO"). In that EO, the Governor explained that the 2021 summer surge in COVID-19 infections "is imperiling the state health system's ability to manage not just COVID-19 patients, but also those who require specialized medical care after car accidents, heart attacks, and other medical emergencies" and that "employer vaccination requirements have become an important tool" for managing the surge. The EO required that state executive-branch employees be "fully vaccinated" against COVID-19 by the later of October 18, 2021, or six weeks after the date that the Food and Drug Administration ("FDA") approves a COVID-19 vaccine. The EO allowed for exceptions for individuals unable to be vaccinated due to disability, a qualifying medical condition, or a sincerely held religious belief.

After the FDA approved the COVID-19 vaccine on August 23, 2021, the Oregon Health Authority ("OHA") adopted similar vaccination rules. One of those rules, then-codified at Oregon Administrative Rule ("OAR") 333-019-1010, is known as the "Healthcare Order."[2] Originally adopted on August 25, 2021, and then modified on September 1, 2021, the Healthcare Order explained, in relevant part:

> Healthcare providers and healthcare staff have contact with
> multiple patients over the course of a typical day and week,
> including providers that provide care for people in their homes.
> Individuals cared for in these settings are more likely than the

---

[2] The OHA suspended OAR 333-019-1010 in mid-2023 and repealed it effective June 30, 2023.

> general public to have conditions that put them at risk for
> complications due to COVID-19. COVID-19 variants are running
> through the state's unvaccinated population and causing an
> increase in breakthrough cases for those who are fully vaccinated.
> This rule is necessary to help control COVID-19, protect patients,
> and to protect the state's healthcare workforce.

OAR 333-019-1010(1) (effective Sept. 1, 2021). Based on these concerns, the Healthcare Order

provided that after October 18, 2021, "A health care provider or healthcare staff person may not

work, learn, study, assist, observe, or volunteer in a healthcare setting unless they are fully

vaccinated or have provided documentation of a medical or religious exception." OAR 333-019-

1010(3)(a) (Sept. 1, 2021).[3]

---

[3] The Healthcare Order defined "healthcare providers and healthcare staff" as:

> [I]ndividuals, paid and unpaid, working, learning, studying,
> assisting, observing or volunteering in a healthcare setting
> providing direct patient or resident care or who have the potential
> for direct or indirect exposure to patients, residents, or infectious
> materials, and includes but is not limited to any individual licensed
> by a health regulatory board as that is defined in ORS 676.160,
> unlicensed caregivers, and any clerical, dietary, environmental
> services, laundry, security, engineering and facilities management,
> administrative, billing, student and volunteer personnel.

OAR 333-019-1010(2)(d)(A) (Sept. 1, 2021). The Healthcare Order defined "healthcare setting"

as:

> [A]ny place where health care, including physical or behavioral
> health care[,] is delivered and includes, but is not limited to any
> health care facility or agency licensed under ORS chapter 441
> or 443, such as hospitals, ambulatory surgical centers, birthing
> centers, special inpatient care facilities, long-term acute care
> facilities, inpatient rehabilitation facilities, inpatient hospice
> facilities, nursing facilities, assisted living facilities, residential
> facilities, residential behavioral health facilities, adult foster
> homes, group homes, pharmacies, hospice, vehicles or temporary
> sites where health care is delivered (for example, mobile clinics,
> ambulances), and outpatient facilities, such as dialysis centers,
> health care provider offices, behavioral health care offices, urgent
> care centers, counseling offices, offices that provide

In late 2021, the United States Secretary of Health and Human Services (the "Secretary"), who administers the Medicare and Medicaid programs, issued an interim final rule amending the existing conditions of participation in Medicare and Medicaid to add a new requirement—that facilities ensure that their covered staff are vaccinated against COVID-19. Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination, 86 Fed. Reg. 61555, 61616-27 (Nov. 5, 2021). The rule required providers to offer medical and religious exemptions and did not cover staff who teleworked full-time. *Id.* at 61571-72. The rule further provided that a facility's failure to comply with the vaccination requirement may lead to monetary penalties, denial of payment for new admissions, and ultimately termination of participation in the programs. *Id.* at 61574. As explained by the Supreme Court, "[t]he Secretary issued the rule after finding that vaccination of healthcare workers against COVID-19 was 'necessary for the health and safety of individuals to whom care and services are furnished.'" *Biden v. Missouri*, 595 U.S. 87, 91 (2022) (citing 86 Fed. Reg. at 61561). The Supreme Court upheld the Secretary's rule as within the Secretary's authority provided by Congress. *Id.* at 93. The Supreme Court added:

> COVID-19 is a highly contagious, dangerous, and—especially for Medicare and Medicaid patients—deadly disease. The Secretary of Health and Human Services determined that a COVID-19 vaccine mandate will substantially reduce the likelihood that healthcare workers will contract the virus and transmit it to their patients. 86 Fed. Reg. 61557-61558. He accordingly concluded that a vaccine mandate is "necessary to promote and protect patient health and safety" in the face of the ongoing pandemic. *Id.*, at 61613.

---

complementary and alternative medicine such as acupuncture, homeopathy, naturopathy, chiropractic and osteopathic medicine, and other specialty centers.

OAR 333-019-1010(2)(e)(A) (Sept. 1, 2021).

*Id.* In mid-2023, the Secretary issued a new rule withdrawing the vaccination requirement. Policy and Regulatory Changes to the Omnibus COVID-19 Health Care Staff Vaccination Requirements, 88 Fed. Reg. 36485, 36488 (June 5, 2023) (effective Aug. 4, 2023).

**B. Trusov's Employment at OHSU**

In August 2013, Trusov began working for OHSU, an Oregon public corporation, as a Registered Nurse in the NICU. After the onset of the COVID-19 pandemic and the availability of COVID-19 vaccinations, OHSU mandated that Trusov receive a COVID-19 vaccination as a condition of continued employment. In September 2021, Trusov put OHSU on notice of her religious belief that she asserts prevented her from receiving a COVID-19 vaccination. In October 2021, OHSU denied Trusov's request for a religious accommodation that would have exempted her from OHSU's vaccination requirement. OHSU placed Trusov on administrative leave on October 18, 2021, and terminated Trusov's employment on December 6, 2021. Trusov alleges that OHSU could have accommodated her religious beliefs without incurring undue hardship.

**C. Procedural History**

Trusov commenced this lawsuit on January 17, 2023. ECF 1. On April 17, 2023, she filed her First Amended Complaint ("FAC"). ECF 7. The FAC asserted two claims for money damages plus a separate request for declaratory relief against OHSU and eight named individual Defendants who are or were members of OHSU's Board of Directors ("OHSU Board") as well as two unnamed individual (Doe) Defendants who are or were members of OHSU's Vaccine Exception Review Committee ("VERC"). Trusov alleged that OHSU violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, by discriminating against her because of her religion. Trusov also alleged that the members of OHSU's Board and VERC violated her First Amendment right to freedom of religion, which is actionable under 42 U.S.C. § 1983. In

addition, Trusov requested declaratory relief stating that OHSU's Board and VERC violated the Free Exercise Clause of the First Amendment. Defendants moved to dismiss the FAC. ECF 9.

The Court granted Defendants' motion as to Trusov's First Amendment and declaratory relief claims, and dismissed the individual Defendants, but denied the motion as to her Title VII claim, declining to resolve OHSU's affirmative defense of undue hardship at the stage of a motion to dismiss. ECF 24. Trusov then filed her SAC in which she asserted a claim only against OHSU, alleging employment religious discrimination in violation of 42 U.S.C. § 2000e-5 under Title VII. ECF 25. OHSU timely answered. ECF 26.

Now before the Court is OHSU's motion for summary judgment, arguing its undue hardship affirmative defense. ECF 31. Also before the Court is Trusov's cross-motion for partial summary judgment, in which she raises the following issues: (1) whether Trusov had a bona fide religious belief; (2) whether Trusov informed OHSU of her religious belief and its conflict with OHSU's COVID-19 vaccination requirement; (3) whether OHSU threatened to discharge and ultimately did discharge Trusov "because of her inability to receive COVID-19 vaccination"; and (4) whether OHSU's evaluation process for Trusov's request for religious accommodation discriminated against her because of her religion. ECF 44.

## DISCUSSION

Trusov argues that OHSU is a covered employer and has engaged in religious discrimination in employment in violation of 42 U.S.C. § 2000e-2(a)(1) by failing to accommodate her and through intentional discrimination. OHSU contends that it could not have accommodated Trusov without suffering undue hardship, and that Trusov has not pleaded a claim for intentional discrimination in her SAC. OHSU has moved for summary judgment to dismiss Trusov's failure to accommodate claim. As noted, Trusov has cross-moved for partial

summary judgment on her purported intentional discrimination claim. The Court addresses each

motion in turn.

## A.  Failure to Accommodate

### 1.  Legal Framework

Under Title VII, it is unlawful for a covered employer "to fail or refuse to hire or to

discharge any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has

explained that Title VII, as originally enacted, did not spell out what the statute meant by

discrimination "because of . . . religion," but the Equal Employment Opportunity Commission

("EEOC") "interpreted that provision to mean that employers were sometimes required to

'accommodate' the 'reasonable religious needs of employees.'" *Groff v. DeJoy*, 600 U.S. 447,

457 (2023) (quoting 29 C.F.R. § 1605.1(a)(2) (1967)). The EEOC then adopted regulations that

"obligated employers 'to make reasonable accommodations to the religious needs of employees'

whenever that would not work an 'undue hardship on the conduct of the employer's business.'"

*Id.* (quoting 29 C.F.R. § 1605.1 (1968)).

In 1970, the Sixth Circuit held that Title VII, as then written, did not require an employer

"to accede to or accommodate" an employee's religious practice because that "would raise

grave" Establishment Clause questions. *Dewey v. Reynolds Metals Co*., 429 F.2d 324, 334 (6th

Cir. 1968), *aff'd by an equally divided court*, 402 U.S. 689 (1971). Responding to *Dewey* and a

similar decision, Congress amended Title VII in 1972 to provide:

> The term "religion" includes all aspects of religious observance
> and practice, as well as belief, unless an employer demonstrates
> that he is unable to reasonably accommodate to an employee's or
> prospective employee's religious observance or practice without
> undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j); *Groff*, 600 U.S. at 458.

In *Groff*, the Supreme Court also clarified what Title VII requires in this area. As explained by the Court, merely "showing 'more than a *de minimis* cost,' as that phrase is used in common parlance, does not suffice to establish 'undue hardship' under Title VII." *Groff*, 600 U.S. at 468. Instead, when an employer asserts the affirmative defense of undue hardship based on cost, the employer "must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id.* at 470. Further, "courts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer." *Id.* at 470-71 (cleaned up).

"What constitutes undue hardship must be determined within the particular factual context of each case." *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999); *see also Groff*, 600 U.S. at 473 (describing the undue hardship inquiry as a "context-specific standard"). "Cost cannot always be measured in terms of dollars," but the employer "must connect the asserted [non-economic] hardship to an adverse impact on the conduct of the business." *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 615 (9th Cir 1988) (quotation marks omitted). Undue hardship also includes increased safety and liability hazards in the workplace. *Bhatia v. Chevron U.S.A., Inc*., 734 F.2d 1382, 1383-84 (9th Cir. 1984).

## 2. Application

For purposes of its summary judgment motion, OHSU does not argue that Trusov has not proven her prima facie case. Instead, OHSU contends that it could not have reasonably accommodated Trusov absent undue hardship. OHSU identifies the two accommodations that Trusov proposed in her EEOC complaint—(1) allowing Trusov to work unvaccinated, or (2) reassigning her to a different position. OSHU asserts that neither alternative was possible

without creating undue hardship. Trusov responds that OHSU would not suffer undue hardship if it would have allowed her to work unvaccinated or reassigned her to another position.[4]

### a. Allow Trusov to Continue Working While Unvaccinated

OHSU contends that allowing Trusov to work while unvaccinated would pose a significant safety risk, increase its operating costs, and compromise OHSU's public mission. OHSU presents the expert report of Dr. Seth Cohen (ECF 32-1) ("Cohen Rep."), and declarations from Dr. Renee Edwards, the Chief Medical Officer of OHSU (ECF 33) ("Edwards Decl."); Dr. Marcel Curlin, the Medical Director of OHSU's Occupational Health Department (ECF 34) ("Curlin Decl."); and Nurse Nikki Wiggins, the Clinical Nurse Manager for OHSU's NICU (ECF 35) ("Wiggins Decl.") in support of OHSU's position.[5]

Scientific data available in 2021 demonstrated that unvaccinated people were significantly more likely than vaccinated people to become infected, or reinfected, with—and develop symptoms of—COVID-19. Curlin Decl. ¶ 31; Cohen Rep. ¶¶ 23, 28. Unvaccinated individuals who were infected with COVID-19 also were more contagious and infectious, and thus transmitted COVID-19 to others at a higher frequency than vaccinated individuals. Curlin Decl. ¶ 32; Cohen Rep. ¶¶ 24-25, 32. Further, vaccinated persons who experienced

---

[4] Trusov argues in her motion that OHSU told her before she submitted her vaccination exemption request that OHSU "would, at worst, place her on unpaid leave and then periodically assess whether and under what circumstances she could return to direct patient care." *See* ECF 45-7 at 3. This situation was for "exempt, but unvaccinated employees," not for those, like Trusov, whose exemption requests were denied. *Id.* Moreover, Trusov does not explain how unpaid administrative leave would constitute an accommodation and not an adverse employment action. Thus, the Court does not consider this as a possible accommodation.

[5] OHSU relies on the information available to it in 2021, when it made its undue hardship determination. *See MacDonald v. Or. Health & Sci. Univ.*, 2024 WL 3316199, at *7 (D. Or. July 5, 2024) (holding that it is appropriate to limit analysis to the information and evidence available at the time). Trusov agrees that this is the proper approach, as does the Court.

"breakthrough" infection were significantly less likely to develop severe COVID-19 and need hospitalization. Curlin Decl. ¶¶ 33-34.

When OHSU terminated Trusov's employment, OHSU was using a combination of vaccination and other protective measures, such as social distancing, personal protective equipment, and regular testing, to prevent the spread of COVID-19. Edwards Decl. ¶¶ 30-31. OHSU concluded that removing *any* of these protective measures, *especially vaccination*, would have increased the risk to OHSU's patients and staff. *Id.* ¶¶ 31-32; Curlin Decl. ¶¶ 35-37. OHSU further determined, based on scientific data and studies, that merely relying on protective measures such as masking and testing were inadequate substitutes for vaccination. Curlin Decl. ¶¶ 29-30, 38-41, 44; Cohen Rep. ¶¶ 33-38.

Allowing Trusov to remain unvaccinated would threaten the health, safety, and even lives of OHSU's patients and staff. Further, many patients at OHSU are particularly vulnerable to developing severe COVID-19 if they are infected. Edwards Decl. ¶¶ 15-18. Specifically, patients in the NICU—neonates and recently pregnant mothers—are especially vulnerable. Wiggins Decl. ¶¶ 13-16. An unvaccinated nurse also would jeopardize the health and safety of coworkers, further creating an undue burden on OHSU.

In addition, allowing Trusov to work unvaccinated would create staffing problems and impair OHSU's critical functions, which also constitutes an undue burden for OHSU. *See generally* Curlin Decl. ¶ 15; *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 68-69, 84 (1977) (impairing critical functions constitutes undue hardship, and creating staffing issues or requiring payment of "higher wages" for substitute workers constitutes substantial increased costs). Being unvaccinated, Trusov would be more likely to contract COVID-19 and to have to quarantine and thus miss work while waiting to recover. Curlin Decl. ¶ 11. Not only were

unvaccinated people more likely to contract COVID-19, but they were more likely to suffer from severe COVID-19 and develop long-COVID-19 symptoms, such as fatigue and cognitive difficulties, that also would result in a more prolonged effect on both the employee and the employer, here OHSU. Cohen Rep. ¶¶ 19, 29. Further, as discussed above, an unvaccinated person likely would infect more coworkers, thereby compounding staffing problems. Trusov's proposed accommodation of working unvaccinated also would require her to test regularly. OHSU spent substantial resources and time to administer COVID-19 tests, as well as to investigate transmissions through contact tracing and lab sequencing, all to help keep the spread of COVID-19 in its hospital under control. Curlin Decl. ¶¶ 10-13, 23-24. These are additional undue burdens.

Finally, allowing an unvaccinated nurse to work with highly vulnerable patients would compromise OHSU's public mission. OHSU is legislatively created and charged with a public mission to "serve the people of the State of Oregon" and "strive for excellence in education, research, clinical practice, scholarship and community service while maintaining compassion, personal and institutional integrity and leadership in carrying out its missions." Or. Rev. Stat §§ 353.030(1)-(2); *see also* Edwards Decl. ¶ 9. This statute requires that OHSU:

> (a) Provide high quality educational programs appropriate for a health and science university;
>
> (b) Conduct research in health care, engineering, biomedical sciences and general sciences;
>
> (c) Engage in the provision of inpatient and outpatient clinical care and health care delivery systems throughout the state;
>
> (d) Provide outreach programs in education, research and health care;
>
> (e) Serve as a local, regional and statewide resource for health care providers; and

> (f) Continue a commitment to provide health care to the
> underserved patient population of Oregon.

Or. Rev. Stat. § 353.030(3). Based on this statute, OHSU describes itself as having obligations

that include:

> (1) providing Oregonians with accessible, exemplary, and safe
> healthcare; (2) maintaining operational capacity and resources and
> a workforce capable of continuously providing essential healthcare
> services; (3) preserving the health and safety of our staff;
> (4) serving the safety and welfare of the community; and
> (5) serving as a model to other healthcare providers in Oregon.

Edwards Decl. ¶ 19. Accordingly, allowing an unvaccinated nurse to work with vulnerable

populations would directly contradict OHSU's first four goals. Moreover, in its role as a model

and resource for other health care providers, OHSU asserts that it could not make a choice that

would endanger patients.

OHSU concluded, based on the information and evidence described above, that an

unvaccinated nurse in the NICU would pose a safety risk to other staff members and the

vulnerable patient population. If OHSU allowed this risk, it would violate its legislatively created

mission to serve the community and keep it safe. Permitting Trusov to work as a NICU nurse

while unvaccinated would unduly burden OHSU's mission and, accordingly, the conduct of its

business.

For all of these reasons, OHSU has demonstrated that allowing Trusov to work in the

NICU while unvaccinated would pose an undue hardship to OHSU. Trusov provides only limited

and incomplete evidence in her attempt to rebut OHSU's arguments and create a genuine issue.

Her primary evidence comes in the form of declarations from ten patient-facing nurses employed

by other health care providers who remained unvaccinated and used N95 masks and protective

eyewear and tested frequently. ECF 47-56. She argues that these accommodations made for other

nurses at other facilities, some of whom also worked in a NICU environment or with vulnerable

populations, indicates that such accommodations are possible and do not impose an undue

hardship. As noted, however, the undue hardship standard is "context-specific" and must be

decided based on the facts of each case. *Groff*, 600 U.S. at 473. OHSU explains how its unique

mission, safety concerns, and operational costs would be substantially affected by allowing

Trusov to continue to work while unvaccinated. Other health care providers may not have made

the same risk calculations or used the same cost-benefit analysis. For example, many of the

nurses whose declarations Trusov provides worked at Catholic hospitals, which have different

priorities and vaccination policies than OHSU. Further, merely because one employer chose to

accept certain risks and burdens to accommodate an employee does not mean that the

accommodation does not present an undue burden for another employer. Drawing all reasonable

inferences in favor of Trusov, her evidence does not raise a genuine issue of material fact for

OHSU's undue hardship determination.

Trusov also contends that OHSU incurred substantial increased costs by terminating the

employment of Trusov and the other two NICU nurses who were denied religious exemptions, as

OHSU needed to replace them with more expensive travel nurses. Specifically, Trusov does not

provide any evidence that the replacement travel nurses were unvaccinated. Moreover, she does

not cite any case law in support of her contention that "where various accommodations pose a

substantial burden, the employer must choose the least burdensome among those options."

*MacDonald v. Or. Health & Sci. Univ.*, 689 F. Supp. 3d 906, 913 n.2 (D. Or. 2023). "If allowing

employees to continue working at OHSU while unvaccinated would have resulted in a

substantial burden to OHSU, it is irrelevant to this Court whether the course that OHSU

ultimately chose also resulted in a substantial burden." *Id.* Trusov's argument about the

replacement travel nurses does not refute OHSU's affirmative defense that it would have faced a

PAGE 15 – OPINION AND ORDER

substantial burden if it had allowed Trusov to continue working at OHSU while unvaccinated. Thus, drawing all reasonable inferences in favor of Trusov, she fails to establish a genuine issue of material fact that OHSU would have faced undue hardship if it had allowed Trusov to continue working as a NICU nurse while unvaccinated.[6]

### b. Reassign Trusov to Another Position at OHSU

Trusov presents another possible accommodation: to reassign her to another position within the hospital where she would not have to work directly with patients. OHSU argues that this too would create a similar staffing shortage as described above because there was a nurse shortage in Oregon at that time. Wiggins Decl. ¶ 36. NICU nurses require specialized training, such that the pool of nurses who could replace Trusov was limited. *Id.* To avoid understaffing in its NICU, OHSU would thus have needed to search for a replacement for Trusov and pay that person's wages while still paying Trusov's salary, creating a substantial increased cost for OHSU.

Similarly, "any accommodation that involved removing [Trusov] from the NICU [while not replacing her] would have shifted [Trusov's] hazardous duties to her coworkers." This poses a substantial non-economic cost to OHSU's business. *See Bhatia*, 734 F.2d at 1383-84. Thus, OHSU has shown that accommodating Trusov by removing her from the NICU and reassigning her to another position would create an undue hardship for OHSU through substantial increased costs, both economic and non-economic.

---

[6] Trusov also argues that OHSU's experts have not "quantified the alleged increased safety risk that would have occurred had OHSU allowed a single unvaccinated NICU nurse to continue to treat neonates while wearing an N95 mask and protective eyewear." She does not cite any authority holding that such risks must be quantified in an undue hardship analysis. Moreover, OHSU presents quantitative evidence of the efficacy of vaccination. *See, e.g.*, Cohen Rep. ¶¶ 23-24, 26; Curlin Decl. ¶¶ 31, 34. Thus, Trusov's argument on this point also is unavailing.

In summary, Trusov does not provide any evidence to respond to OHSU's arguments and evidence sufficient to create a genuine issue of material fact. The Court therefore grants summary judgment to OHSU because there is no genuine dispute that Trusov's proposed accommodations would cause OHSU to suffer a substantial and undue hardship.

## B. Intentional Discrimination

In Trusov's cross-motion for partial summary judgment, she requests summary judgment on the issue that OHSU intentionally discriminated against her "in the manner in which it conducted its religious accommodation process." OHSU responds that any "intentional discrimination" claim is not apparent on the face of the SAC, nor is it well-pleaded. OHSU also argues that Trusov failed to exhaust administrative remedies for an intentional discrimination claim, and that she fails to establish the absence of a genuine issue of material fact. Trusov replies that she has sufficiently pleaded this claim, that OHSU was sufficiently on notice of that claim, and that there is no genuine issue of material fact sufficient to deny Trusov's motion.

To plead a claim for intentional discrimination, Trusov must establish that

> (1) [s]he is a member of a protected class; (2) [s]he was qualified for [her] position; (3) [s]he experienced an adverse employment action; and (4) similarly situated individuals outside [her] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination.

*Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004). OHSU argues that, among other things, Trusov does not satisfy the fourth element, as she does not identify any similarly situated coworkers who were treated differently and does not allege that OHSU was discriminating between religious beliefs.

Trusov does not dispute that she has not identified similarly situated individuals outside her protected class who were treated more favorably. Instead, she argues that "when employers

make categorical policies about what types of beliefs will be considered religious and what types of conduct will make every religious employee insincere the employer has engaged in an unlawful employment practice under Title VII." As OHSU states, however, it is not discriminatory to distinguish between sincerely held religious beliefs and other personal preferences. *See Doe v. S. D. Unified Sch. Dist.*, 19 F.4th 1173, 1180 (9th Cir. 2021) ("[A]lthough Title VII prohibits employment discrimination based on religion, an employee's request for an exemption from a COVID-19 vaccination mandate can be denied on the ground that the employee's belief is not truly religious in nature . . . ."). Accordingly, the SAC does not sufficiently plead an intentional discrimination claim, and the Court denies Trusov's motion for summary judgment on this ground.[7] Because the Court finds that Trusov has not sufficiently pleaded this claim, it does not reach OHSU's other arguments. Nor is it necessary to decide whether Trusov had a bona fide religious belief or whether any such belief rendered her "unable" to receive the COVID-19 vaccination.[8] The Court thus denies Trusov's partial motion for summary judgment in its entirety.

---

[7] Trusov also has not moved to amend her SAC to add a claim of intentional discrimination. Moreover, doing so now would be untimely. A response to summary judgment is not the time to amend pleadings or raise new claims. *See, e.g., La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010) (stating that the plaintiff "may not effectively amend its Complaint by raising a new theory of standing in its response to a motion for summary judgment"); *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (stating that when allegations are not in the complaint, "raising such claim in a summary judgment motion is insufficient to present the claim to the district court"), *overruled in part on other grounds by Apache Stronghold v. United States*, 95 F.4th 608 (9th Cir. 2024); *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." (quoting *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 24 (1st Cir. 1990))).

[8] As OHSU also argues, summary judgment is not proper because "issues of [Trusov's] sincerity and religiosity—and whether her purportedly religious beliefs in fact rendered her 'unable' to become vaccinated—are classic questions of fact and credibility" that cannot be decided on a motion for summary judgment.

**CONCLUSION**

The Court GRANTS OHSU's motion for summary judgment (ECF 31) and DENIES

Trusov's cross-motion for partial summary judgment (ECF 44).

**IT IS SO ORDERED**.

DATED this 26th day of August, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge